IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| SIMON COLE, individually, and d/b/a<br>DAWN OF GAMES, and KARL TUCKER,<br>Individually, and on behalf of<br>KARL TUCKER PRODUCTIONS,<br>INC., and BENJAMIN PAUL<br>BISTLINE, individually, and on behalf<br>Of P&V CAPITAL RESOURCES, INC.,<br>And JUSTIN BOWMAN &<br>JOHN BARROSO,<br>Individually, and d/b/a JSB<br>INVESTMENTS, and JOHN<br>MCCORMACK, individually and<br>ALEXANDER LOZANO, individually<br>And on behalf of AES TRADING, INC.,<br>And DAVID K. CABAGE, individually,<br><br>    Plaintiffs,<br><br>v.<br><br>GREGORY M. SCHNEIDER,<br>AMANDA SCHNEIDER,<br>BRIAN C. COOK, individually and d/b/a<br>SHIPPING SOLUTIONS, INC.,<br>SHIPPING SOLUTIONS<br>FULFILLMENT, INC., d/b/a<br>REED FROG USA, d/b/a IDEA<br>FACTORY COMPANY, d/b/a<br>TZD.COM, d/b/a C4GAMESTORE.<br>COM. d/b/a HOTGAMESTUFF.COM<br> And BLUE SKY CAPITAL<br>MANAGEMENT CORPORATION,<br>d/b/a PLUGNPLAYFOREX.COM,<br><br>    Defendants. | Docket #3:08CV1013<br><br>HON. WILLIAM J. HAYNES |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR NEW TRIAL OR IN THE ALTERNATIVE MODIFACATION OF THE JURY'S VERDICT**

**TESTIMONY**

There were 8 individual plaintiffs who were pursuing claims against the corporate and individual defendants. For purposes of simplicity and in order to better follow the trial, the Defendants will cite to the trial testimony as it proceeded.

The first witness called by the Plaintiffs was Paul Bistline who testified that he was a

truck driver from Utah. He decided that he and his wife wanted to invest in an internet-based business. (*doc. 115, page 1-6*). Mr. Bistline admitted that the information he received, initially from Shipping Solutions, was not what he ultimately entered into with the Defendants. (*doc. 115, page 7*). Mr. Bistline believed that Shipping Solutions would take his investment to purchase video games at a discount, and then sell them for a profit. He would receive profits based on the percentage of his investment into a large pool of monies. *(doc. 115, page 8-9)*. Mr. Bistline ultimately spoke to Mr. Schneider on the first week of December, 2007. Mr. Schneider explained that there was a $35,000 initial fee and $65,000 would be used to purchase inventory. *(doc. 115, page 10-11)*.

A few days after having discussions with Mr. Schneider, Mr. Bistline flew to Nashville on December 8th, 2007 for the purpose of seeing the warehouse, inventory, overall business, and as Mr. Bistline said "…decide at that point whether this was viable or not, to invest.". *(doc. 115, page 11)*. Mr. Bistline never met Mr. Cook. *(doc. 115, page 12)*. Mr. Bistline testified that there was a $35,000 fee to join Shipping Solutions, which he paid. *(doc. 115, page 24)*. Mr. Bistline ultimately wrote a check for $115,000, a combination of $35,000 to go into business, and $80,000 to purchase inventory. *(doc 115, page 25-26)*. Mr. Bistline referred to trial Exhibit "3" as a basis for his understanding of the agreement between he and Mr. Schneider. *(doc. 115, page 33-34)*.

When Mr. Bistline was cross-examined, he admitted that within 2 weeks of initially discovering this business opportunity, he flew to Nashville and invested $115,000. *(doc. 115, page 44)*. He also acknowledged that the extent of his investigation of this business opportunity was through brochures, as evidenced in trial Exhibit "3". *(doc. 115, page 45)*. Mr. Bistline admitted to entering into a contract with Shipping Solutions which was

identified as trial Exhibit "62". *(doc. 115, page 46-47).*

Next, Mr. Lozano testified that he was a resident in the state of California, and that he had an internet-based company selling auto parts and accessories. *(doc. 115, page 53).* He first learned about Shipping Solutions when he was searching for business to invest in. *(doc. 115, page 53).* Mr. Lozano spoke to Mr. Schneider sometime at the end of October, 2007. *(doc. 115, page 54).* Mr. Lozano mentioned his concerns regarding Shipping Solutions being a Ponzi scheme. *(doc. 115, page 55).* Mr. Schneider directed Mr. Lozano to his website, where Mr. Lozano read more information about the company. Mr. Schneider explained to Mr. Lozano that there was a $35,000 joining fee to cover operating costs, and the remaining investment would go towards inventory. *(doc. 115, page 57).* Mr. Schneider provided Mr. Lozano PayPal transactions, but this was the extent of the financials that Mr. Lozano reviewed. *(doc. 115, pages 58-59).* Sometime in February, 2008, Mr. Lozano flew to Nashville to check out the business. *(doc. 115, page 61).* During that visit Mr. Lozano met Brian Cook, who informed Mr. Lozano that he, too, was an investor. *(doc. 115, page 62).*

When Mr. Lozano was cross-examined, he admitted that even his mother told him not to invest in this risky venture. *(doc. 155, page 77).* Mr. Lozano admitted that the Shipping Solutions business model was similar to his, in which he may purchase a product at a lower price, and put it on the market at a higher price, and that the difference would be the profit. *(doc. 115, page 78).* Mr. Lozano acknowledged entering into a contract with Shipping Solutions. *(doc. 115, page 79; trial exhibit "65").* Although Mr. Lozano does claim that this was some sort of scam perpetrated by the Defendants, he does acknowledge that the PayPal documents that he reviewed were legitimate. *(doc 115, page 92).* Lozano stated that Shipping Solutions started out as a legitimate business, but that the Defendants got in over their heads

and then needed more money, which lead to it becoming a Ponzi scheme. *(doc 115, page 92).* Furthermore, Mr. Lozano stated that when he came to Nashville and looked at the warehouse, that he believed that at that time Shipping Solutions was a legitimate internet video game business. *(doc. 115, page 93).* What Mr. Lozano could not testify to is to when this legitimate business turned into a Ponzi scheme. *(doc. 115, page 94).*

Mr. Lozano testified that the returns that the Defendants claimed that the business had been making were for approximately 6 months. Mr. Lozano thought that these returns were since the business had begun. *(doc. 115, page 95).* Ultimately, Mr. Lozano admitted that he had only relied on 6 months worth of returns when he decided to invest $100,000 into this business. *(doc. 115, page 96).* When Mr. Lozano was asked what lie he believed the Defendants had told him, he referred to the returns that had been given to him, but he could not state specifically what was wrong with the returns other than at some later point in time the Defendants experienced accounting issues, and that there were no actual profits being made by Shipping Solutions. *(doc.115, pages 105-106).*

The next witness who testified was Carl Tucker, who responded to the internet advertisement, and as a result received an e-mail reply from Shipping Solutions. *(doc. 115, page 113).* Mr. Tucker states that he spoke to Mr. Schneider about the business opportunity. *(doc. 115, pages 117-118).* Mr. Tucker understood that from the $100,000 he initially invested that $65,000 would go towards inventory, and that $35,000 would go to the Defendants for the purposes of running the business. *(doc. 115, page 123).* Mr. Tucker identified the contract he had entered into with Shipping Solutions. *(doc. 115, page 124; trial Exhibit "61").* Mr. Tucker testified that the basis of his investment in the company was a combination of the information found on the company's website, the conversations he had

with Mr. Schneider, and the contract. *(doc. 115, page 139).*

The next Plaintiff that testified was Justin Bowman, who resided in the state of California, and who was in the home loan business. *(doc. 115, page 157-158).* Mr. Bowman inquired about an advertisement on bizbuysell.com, and received an email from Mr. Schneider at Shipping Solutions. *(doc. 115, page 160).* After receiving this email, Mr. Bowman spoke with Mr. Schneider, and ultimately came to Nashville to see the operation *(doc. 115, page 161).* Mr. Bowman's brother-in-law, John Barroso, also became involved in this business opportunity with Shipping Solutions. *(doc. 115, page 161).* Mr. Bowman and Mr. Barroso were business partners *(doc. 115, page 161).* Both gentlemen traveled to Nashville in the end of September, 2007. *(doc. 115, page 162).* During their visit to Nashville they visited Shipping Solutions and had discussions with both Mr. Schneider and Mr. Cook. *(doc. 115, page 168).*

Mr. Bowman testified that he became concerned later when he noticed that the profits were not increasing in amount, and as a result he checked the company's status on E-bay. He noted that there were negative feedbacks and other issues that were developing. *(doc. 115, page 176).* Mr. Bowman began his inquiries in February, 2008. *(doc. 115, page 177).* Mr. Bowman did enter into a contract with Shipping Solutions. *(doc. 115, pages 180-181; trial Exhibit "63").*

Mr. Bowman testified that when he visited Nashville, he believed that Shipping Solutions was a legitimate business. (doc. 115, page 182). Mr. Bowman also acknowledged the Defendants had been pursuing this particular business model for only 6 months. *(doc. 115, page 186).* When Mr. Bowman was asked during his cross-examination whether he believed a Ponzi scheme was taking place in the fall of 2007, Mr. Bowman testified that he did not believe a Ponzi

scheme was taking place at that time. *(doc. 115, page 189)*. Mr. Bowman believed that Shipping Solutions was successful at that time, based on his investigation of the business E-bay account. *(doc. 115, page 189)*. Mr. Bowman believed that the business changed into a scheme in 2008, when the Defendants were still accepting investors although profits were dwindling. *(doc. 115, page 189)*. When Mr. Bowman was questioned about the contract he did admit that there was a discrepancy in portions of the contract regarding how fees would be paid. *(doc. 115, page 193)*.

The next Plaintiff to testify is Mr. Bowman's brother-in-law, John Barroso. *(doc. 116, page 5)*. Mr. Barroso confirmed that he had discussions with Mr. Schneider in September, 2007 regarding the possibility of investing with Shipping Solutions. *(doc. 116, page 7)*. Mr. Barroso travelled to Nashville to see the operation. *(doc. 116, page 10)*. When Mr. Barroso arrived in Nashville he toured the Shipping Solutions facility, where he had the opportunity to see employees pack and ship video games, and was excited to see this operation. *(doc. 116, page 11)*. However, Mr. Barroso did not immediately invest in Shipping Solutions, but he did some serious due diligence, as he described it, for several weeks before making any investment with Shipping Solutions. *(doc. 116, page 14)*. Mr. Barroso requested the E-bay information because he knew that the E-bay information would not be false. (doc. 116, page 15). Mr. Barroso had meetings with several lawyers before making a decision to enter into a contract and invest with Shipping Solutions. *(doc. 116, page 17)*. Mr. Barroso admitted that he had entered into a contract that was identified as Exhibit "63". *(doc. 116, page 17; trial Exhibit "63")*. When cross-examined, Mr. Barroso acknowledged that as far as he was concerned, Shipping Solutions was a legitimate business at the time he chose to invest, but at some point in time after, the business turned into something different. *(doc. 116, page 28)*. When Mr. Barroso was cross-examined regarding his investigation prior to his visit to

Nashville, he stated that there were a few phone conversations, and he investigated the E-bay information. *(doc. 116, page 29).* In fact, this was the first video game business that Mr. Barroso and Mr. Bowman had explored. *(doc. 116, page 30).*

The next Plaintiff to testify was Simon Cole who inquired about Shipping Solutions in the fall of 2007. Mr. Cole was interested in selling video games over the internet. *(doc. 116, page 37).* Mr. Cole spoke to Mr. Schneider about the possibility of investing in Shipping Solutions. *(doc. 116, page 39).* Mr. Cole stated that he was an investment partner with John McCormack. *(doc. 116, page 42).* Mr. Cole indicated that he and Mr. McCormack sent their investment money to Shipping Solutions the first week of December, 2007.

When Mr. Cole was cross-examined he did admit to entering into a contract with the Defendants, as evidenced by trial Exhibit "60". *(doc. 116, page 59).* Mr. Cole testified that at the time he invested his money in Shipping Solutions, he believed that it was a legitimate business based on the E-bay transactions that had been provided to him. *(doc. 116, page 67).*

The next Plaintiff to testify was John McCormack, who was a good friend of Mr. Cole. *(doc. 116, page 72).* Mr. McCormack admitted that he did not have any personal conversations with Mr. Schneider or Mr. Cook, but that he had received his information regarding Shipping Solutions from Mr. Cole. (*doc. 116, page 74).* In March, 2008, Mr. McCormack travelled to Nashville for the purpose of investigating Shipping Solutions so that he might invest in the business. *(doc. 116, page 78).* Mr. McCormack identified the contract in which he entered into with Shipping Solutions as evidenced by trial Exhibit "64". *(doc. 116, page 82).*

The next Plaintiff to testify was David Cabage. Mr. Cabage stated that he spoke with Mr. Schneider over the telephone, as well as conducted a background check on Mr. Schneider

and Mr. Cook. *(doc. 116, page 113)*. Mr. Cabage had an attorney review his contract with Shipping Solutions before travelling to Nashville to meet Mr. Schneider and Mr. Cook. *(doc. 116, page 113)*. Sometime in March, 2008, Mr. Cabage met with Mr. Cook and Mr. Schneider. *(doc. 116, page 114)*. When cross-examined, Mr. Cabage identified the contract he entered into with Shipping Solutions as trial Exhibit "66". *(doc. 116, page 119)*. Mr. Cabage also admitted that when he entered into business with Shipping Solutions that the company had only been in operation for 9 months. *(doc. 116, page 123)*. When Mr. Cabage was asked why he invested in Shipping Solutions, he stated that Mr. Schneider and Mr. Cook were expecting a growth in business, and that they had several other opportunities that they were looking into. *(doc. 116, page 123)*. Mr. Cabage did note that upon his inspection of the Shipping Solutions warehouse that the shelves were approximately half empty, but chose not to question the Defendants in regards to the lack of inventory. *(doc. 116, page 129)*.

The next witness to testify was Jason Wilson, and employee of Shipping Solutions, who began his employment at Shipping Solutions in June, 2007. *(doc. 116, page 141)*. Mr. Wilson described his job as a buyer of video games for the company. *(doc. 116, page 141)*. Mr. Wilson testified that he purchased approximately $20,000 worth of video games per month, but in later months he purchased more, due to the holiday season. *(doc. 116, page 145)*. Mr. Wilson stated that he left Shipping Solutions because he had become involved in E-bay suspending Shipping Solution's E-bay account and in turn Shipping Solutions decided to put distance between itself and Mr. Wilson. *(doc. 116, page 151)*. Mr. Wilson stated that there was not an abundance of work for him in July, 2008. *(doc. 116, page 151)*. Mr. Wilson testified that there was a shift from E-bay to Amazon, and that shift occurred during the first part of 2008. *(doc. 116, page 154)*. Mr. Wilson described in some detail how many video

games would come into the warehouse, and how they were inventoried and placed for sale. *(doc. 116, page 159)*. Mr. Wilson stated that in May, 2008, Shipping Solutions was no longer allowed to sell video games on E-bay due to their account being suspended. *(doc. 116, page 164)*.

Brian Cook was called by the plaintiffs. *(doc. 116, page 167)*. Cook testified that his relationship with shipping solutions evolved from inventory partner to its chief financial officer. *(doc. 116, page 179)*. In June 2007 Mr. Cook entered into an arrangement with Mr. Schneider where he was an inventory partner and in doing so he put $200,000.00 dollars of his own money, which he characterized as his life savings, into the purchase of inventory as well as paying Mr. Schneider $25,000.00 in a fee. *(doc. 116, page 177)*. Not all of the $200,000.00 was used to purchase inventory immediately. *(doc. 116, page 178)*. At the time that Mr. Cook made his initial investment, he testified that he would come to the office everyday to see how things were going since he lived in Nashville. *(doc. 116, page 179)*. He stated that the purpose of his visits was to see what was going on and to see what was being purchased *(doc. 116, page 179)*. He also wanted to see what was on the shelves and what was being shipped out and he got to see all of that. *(doc. 116, page 179)*.

After June 2007 his relationship with Mr. Schneider evolved wherein Mr. Cook came up with the idea to invest larger amounts into inventory which he thought would turn into larger profits. *(doc. 116, page 180)*. At the end of August or first part of September 2007, Mr. Cook actually formalized his relationship with Shipping Solutions and because the CFO. *(doc. 116, page 181)*. Mr. Cook described his activities once he became Chief Financial Officer as running the day to day business activities and that Mr. Schneider was responsible for marketing and sales and client relations. (*doc. 116, page 192)*.

Mr. Cook described how the profits were determined. *(doc. 116, page 204).* He stated the profits were based on the total profits earned on the pool of monies put in by everyone. *(doc. 116, page 204).* Mr. Cook briefly described the purpose of Shipping Solutions fulfillment but did not go into any specific detail about when it was formed. *(doc. 116, page 214).* Mr. Cook described his interactions with the accountant who determined that Shipping Solutions had been operating at a loss even though Mr. Cook believed that they had been showing a profit. *(doc. 116, page 215).*

When asked about Mr. Wilson's testimony, Mr. Cook disagreed with Mr. Wilson's estimation of what the inventory was in May 2008. *(doc. 116, page 221).* When Mr. Cook was asked about how much money came back to Shipping Solutions from the foreign currency account in 2008, he testified that out of the $467,000.00 that had been transferred into the account, $436,000.00 actually came back into the Shipping Solutions account and that $29,000.00 was unaccounted for. *(doc. 117, page 17-18).*

When Mr. Cook was asked why he didn't return the Plaintiff's money, his response was that Shipping Solutions was still a viable business based on the Amazon Model that the company was developing. *(doc. 117, page 19).* Mr. Cook really believed in the Amazon Model and what it could do for the company. *(doc. 117, page 19).*

Mr. Cook testified that Shipping Solutions did sustain a loss in the Foreign Currency market in February 2008; five hundred sixty-two thousand dollars was put in a Foreign Currency market account and only $315,000.00 was brought back into the Shipping Solutions account which resulted in a $242,000.00 loss; Mr. Cook testified that $125,000.00 of that loss was his personal money that he had put into Shipping Solutions back in June of 2007 and that the remaining losses involved fees that had been given to Shipping Solutions by the Plaintiffs and

others. *(doc. 117, pages 44-46)*. Mr. Cook stated that the Plaintiffs' money was never at risk and that none of the Plaintiffs' money was lost. *(doc. 117, page 46-47)*.

Mr. Cook further testified that all the financial documents regarding the company had been produced to the Plaintiffs through Quick Books. *(doc. 117, page 58-59)*. Mr. Cook went into further explanations about the monies that had been transferred to the Foreign Currency exchange account and what date those monies actually came back into the Shipping Solutions account. *(doc. 117, page 60)*. Mr. Cook testified that the Shipping Solutions ended its business operations sometime in November 2008 when they vacated the warehouse. *(doc. 117, page 68)*. Up until that time, Mr. Cook continued to operate the business and tried to make it successful and in doing so, he continued to incur expenses for salaries and overhead. *(doc. 117, page 67-70)*. Mr. Cook again testified that he had provided Plaintiffs' counsel with all the discovery information regarding the expenses that were incurred in 2008 by Shipping Solutions that that information was provided in Quick Books documentation. *(doc. 117, page 71-72)*.

Mr. Schneider was called as a witness by the Plaintiffs. (doc. *117, p. 74)*. In or around January 2007, Mr. Schneider began a new business concept selling video games on Ebay. *(doc. 117, page 86)*. His role was to help people set up their own business and he would take a set-up fee along with certain fees per transaction. *(doc. 117, page 86)*. Around August or September 2007 the business model changed. *(doc. 117, page 87)*. Prior to August and September 2007, most of his customers where buying video game inventory in the $10,000 to $25,000 range, but when Mr. Cook came along he was interested in putting in substantially more than that and the most Mr. Schneider could buy in inventory at that time was $80,000. *(doc. 117, page 87)*. Mr. Schneider went into detail to explain how the new business model came about. *(doc. 117, page*

*93).* He explained that Ebay fees were very expensive and that by pooling monies together, he could reduce those fees. *(doc. 117, page 93).*

Mr. Schneider testified about a financial loss as a result of making trades in the Foreign Currency market in February 2008. *(doc. 118, page 13-14).* When he was asked whose money it was, Mr. Schneider explained that a lot of the monies that were in that account at the time the loss was incurred was Mr. Schneider's money from fees and capital from Mr. Cook and other monies that had already been in the company before the Plaintiffs came on board. *(doc. 118, page 13-14).* Mr. Schneider explained that when there was no inventory out on the market to purchase at a given time, then monies that Shipping Solutions had on hand would be transferred to the Foreign Currency account and brought back into Shipping Solutions when there was a need for it to either purchase inventory or to pay overhead. *(doc. 118, p age16).*

When Mr. Schneider was asked what he was doing for Shipping Solutions in the summer of 2008, he implied that he was trying to get the Amazon Model going and he was spending a significant amount of time trying to make that happen. *(doc. 118, page 17).* He explained that he was testing the Amazon Model in order to determine what items would sell and generate the most profits and that took a substantial amount of time. *(doc. 118, page 17).* In fact, it wasn't until August 2008 before Shipping Solutions was able to move aggressively on that Amazon Model. *(doc. 118, page 17).* When Mr. Schneider was asked how was the money from Mr. Cabbage and Mr. Mcormick used by the company when they paid their contributions in March and April 2008, Mr. Schneider responded that those monies were used for overhead of the company. *(doc. 118, page 18).* Mr. Schneider reiterated that the Plaintiffs never lost any money in the foreign currency market and that the money that was lost was his or Mr. Cook's. *(doc. 118, page 44).*

Mr. Schneider went on and explained why he believed Shipping Solutions failed. *(doc. 118, page 44)*. Mr. Schneider explained that there was a significant drop off in sales in January 2008; Ebay had announced that they were going to change their policy regarding the positive and negative feedback which significantly impacted the company; the company's Ebay account was shut down due to Mr. Wilson; and when the accountant identified the fact that the company had actually been operating as a loss, the company had to immediately reconsider overhead including staff. (*doc. 118, page 44-48).*

There were other things as well that Mr. Schneider talked about including errors in inputting information into the computer system which affected the ability to determine what profits were actually being me made on games being sold. *(doc. 118, page 51-53)*. Mr. Schneider described that upon changing the business model the company sold $17,000.00 dollars worth of items in one day and at that point he had realized that the new business model could be successful but by that time the monies the company had was dwindling. *(doc. 118, page 57)*.

Mr. Cook was then called on the by the defense and he explained why he believed the company had failed. *(doc. 118, page 81-82)*. Upon cross examination by Plaintiffs' counsel Mr. Cook testified that the Plaintiffs put $916,000.00 into Shipping Solutions between September 2007 and April 2008. *(doc. 118, page 85-86)*. It was also established that the Plaintiffs received back almost $100,000.00. *(doc. 118, page 91)*.

### THERE WAS INSUFFICENT EVIDENCE TO ESTABLISH THAT THE DEFENDANTS VIOLATED ANY OF THE PLAINTIFFS' RIGHTS JUSTIFYING JUDGMENT AGAINST THE DEFENDANTS.

The Plaintiffs by their own testimony concluded that when they invested their money with the Defendants, Shipping Solutions was a legitimate enterprise and that at some point in time that changed. Yet, the plaintiffs begin the trial claiming that the defendants were running a ponzi

scheme from the beginning. There was no evidence presented that the defendants had the intent to defraud the plaintiffs. In fact the opposite is true. The Defendants had a new business model that ultimately failed which resulted in everyone losing money. Most if not all the plaintiffs relied heavily on the E-bay records that no one challenged as anything other than legitimate.

The plaintiffs argued that the defendants lost all of the plaintiffs' money in the foreign currency market but the evidence at trial was that there was a $242,000.00 loss in February 2008 and in the rest of 2008 $29,000.00 could not be accounted for, but the other monies were used in the running of Shipping Solutions. The Plaintiffs had all the financial records of the defendants and could have shown where all the money went but they did not do that. Instead, they made the general argument that "we lost money so u must have stolen it." The burden was on the plaintiffs to prove their causes of actions and they did not, but instead threw around words like "ponzi scheme" and the jury bought into to it without proof to support it.

FRAUD

Intentional misrepresentation is analyzed as a claim for fraud under Tennessee law. *Shahrdar v. Global Hous., Inc.,* 983 S.W.2d 230, 237 (Tenn.Ct.App.1998). As such, it must be stated with particularity, and the plaintiff must, at a minimum, allege the time, place and content of the misrepresentations; the defendant's fraudulent intent; the fraudulent scheme; and the injury resulting from the fraud. FED. R. CIV. P. 9(b); *Coffey v. Foamex, L.P.,* 2 F.3d 157, 161-62 (6th Cir.1993). The elements of a fraud claim are: (1) an intentional misrepresentation of material fact; (2) the misrepresentation was made "knowingly," "without belief in its truth," or "recklessly without regard to its truth or falsity"; (3) the plaintiff reasonably relied on the misrepresentation and suffered damages; and (4) the misrepresentation relates to an existing or past fact, or, "if the claim is based on promissory fraud, then the misrepresentation must

'embody a promise of future action without the present intention to carry out the promise' [.]" [Stacks v. Saunders, 812 S.W.2d 587, 592 (Tenn.Ct.App.1990)](internal quotation marks and citations omitted).

Fraudulent inducement, recognized in Tennessee as promissory fraud, requires that the misrepresentation be made without the present intention to carry it out. Neither the failure to in fact keep the promise, nor the plaintiff's subjective impression will demonstrate that there was no present intention to carry out the promise. [Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n, 835 S.W.2d 25, 29 n. 2 (Tenn.Ct.App.1992)](link).

The evidence at trial did not support the finding of fraud by the jury. What the evidence showed was that the defendants failed to keep their promises and the plaintiffs had the subjective view that the defendants were stealing their money in a ponzi scheme when they stopped getting their profit checks. There were no intentional misrepresentations of material fact made knowingly or without belief in its truth or recklessly without regard to its truth or falsity and to the extent there were statements made that seemed questionable there was no evidence that the plaintiffs reasonably relied on those misrepresentations and suffered damages. There was no evidence that either Mr. Cook or Mr. Schneider made claims regarding returns that were not supported and that their claims that they would try to attain those same returns were promises of future action without their present intention to carry them out.

## NEGLIGENT MISREPRESENTATION

Although the plaintiffs' claim for negligent misrepresentation may have been the plaintiffs' strongest claim, the proof at trial did not support this finding either. In order to prevail on a negligent misrepresentation claim, the plaintiffs must establish the following four elements:

(1) the defendant is acting in the course of its business, profession, or employment, or in a transaction in which it had a pecuniary (as opposed to gratuitous) interest; and (2) the defendant supplies faulty information meant to guide others in their business transactions; and (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and(4) the plaintiff justifiably relies upon the information. The information given to the plaintiffs was based on a business model that had been in place only a short period of time. The plaintiffs knew that and knew that there were risks but after they lost money they claimed that this business in all respects was a sure thing. That defies logic. The information most of the plaintiffs relied were the E-Bay documents and the returns that had been mentioned which were not disproved by the plaintiffs. The defendants actually conveyed the accounting issue when it came to light. The losses in the foreign exchange market took place but those losses were out of the defendants' monies and not the plaintiffs.

## BREACH OF FIDUCIARY DUTY

Next, the plaintiffs claim that the defendants had a fiduciary duty to them. A fiduciary duty exists when "special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence." *Allen Realty Corp. v. Holbert,* 227 Va. 441, 318 S.E.2d 592, 595 (1984) (citation omitted). Not all business relationships, however, result in fiduciary relationships. "Just because there is a business relationship even if it is of a long duration and involves large sums of money, it does not automatically create a fiduciary relationship. Likewise, it is not a fiduciary relationship just because one party to the transaction unilaterally decides to place his trust in the other party casting aside all caution and relying totally on the other party." *Pierce Financial Corp. v. Sterling Cycle, Inc.,* 1992 WL 884734, at *5 (Va. Cir. June 15, 1992). This is exactly

what the plaintiffs did. Some of these Plaintiffs invested over a hundred thousand dollars with Shipping Solutions within days of finding out about the opportunity. There is no question that these plaintiffs casted aside all caution and now blame the defendants for their losses. The defendants had no fiduciary duty and if they did they did not breach it based on the evidence at trial. A fiduciary is not an insurer, *Young v. Phillips,* 170 Tenn. 169, 93 S.W.2d 634 (1936) but that is what the plaintiffs argued at trial and that is what the jury held in their verdict.

## CONVERSION

The plaintiffs also argue that the defendants converted their money. Conversion is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights. *Barger v. Webb,* 216 Tenn. 275, 391 S.W.2d 664, 665 (1965); *Lance Prods., Inc. v. Commerce Union Bank,* 764 S.W.2d 207, 211 (Tenn.Ct.App.1988). Conversion is an intentional tort, and a party seeking to make out a prima facie case of conversion must prove (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights. *Kinnard v. Shoney's, Inc.,* 100 F.Supp.2d 781, 797 (M.D.Tenn.2000); *Mammoth Cave Prod. Credit Ass'n v. Oldham,* 569 S.W.2d 833, 836 (Tenn.Ct.App.1977). Although the plaintiffs claimed this occurred, there was not sufficient evidence to establish those elements. The plaintiffs signed a contract giving their monies to the defendants including a 35,000.00 that was earned upon receipt, and there was no evidence that any of the monies of the plaintiffs were taken by the defendants under this conversion theory. The defendants provided their business records and none were submitted showing specifically where any of the defendants simply "took off with their money." The opposite is true. Other than $29,000.00, all the money was accounted for and the plaintiffs failed to prove that any of that was theirs rather than the defendants.

## TCPA

As it relates to the plaintiffs' claims for violations of the TCPA and the Tennessee Securities Act, the defendants argue that because the plaintiffs failed to establish the elements of fraud, they also fail on these claims as these claims are predicated on the same findings of fact. The Tennessee Consumer Protection Act (TCPA) provides a cause of action for one who suffers an ascertainable monetary loss as a result of another's unfair or deceptive acts. TENN. CODE ANN. § 47-18-109(a)(1). The plaintiffs argued during the entire trial that the Shipping Solutions was from the outset a ponzi scheme which supported their TCPA claim. The evidence did not support that.

Furthermore, the Notwithstanding the Tennessee Consumer Protection Act's broad language, Tennessee's state courts and the federal courts in Tennessee construing Tennessee law have in the past declined to apply the Act to any act or practice related to the marketing or sale of securities. The United States District Court for the Middle District of Tennessee first addressed this issue in 1989. *Nichols v. Merrill Lynch, Pierce, Fenner & Smith,* 706 F.Supp. 1309 (M.D.Tenn.1989). *However, see Johnson v. John Hancock Funds 217S.W.3d 414 (Tenn. Ct. App. 2006) holding the opposite.*

## TENNESSEE SECURITIES ACT

The plaintiffs claimed in their complaint that the defendants violated the Tennessee Securities Act, but there was no proof that what was being offered was a security. In addition, since the plaintiffs failed to establish the elements of fraud then they would also fail to establish the elements of this cause of action.

CONCLUSION

This Court should either allow for a new trial or amend the verdict because the jury had no basis to award the damages they did. The jury awarded the plaintiffs all of their money back and ignored that the plaintiffs in total had received back almost $100,000.00. The jury had no authority to award more than the plaintiffs' had lost. In addition, the jury divided the damages with 1/3 against Schneider, 1/3 against Cook, and 1/6 against Shipping Solutions and 1/6 against Shipping Solutions Fulfillment, Inc even though there is no proof that Shipping Solutions Fulfillment, Inc. had dealings with all the plaintiffs.

Also, there was not sufficient evidence to warrant awards against the individual defendants on the grounds that the corporate veil was pierced or that the individual defendants entered to agreements with the plaintiffs. The parties had a contract and the parties were bound by that contract. The plaintiffs did not sue for breach of contract and therefore should not have been able to recover against the defendants even when reviewing the evidence in the light most favorable to them.

Respectfully Submitted,

/s/Mark T. Freeman

Mark T. Freeman, Esq. (#16098)
One American Center
West End Avenue Suite 240
Nashville, Tennessee 37203
freemanlaw@comcast.net
615-352-8447 office
615-352-7884 fax

## CERTIFICATE OF SERVICE

       I hereby certify that a true and correct copy of the foregoing has been sent by way of the electronic filing system on April 27, 2010 to:

Bryan Becker
Becker Attorneys
The Koll Center
501 West Broadway
Suite 800
San Diego, CA 92101
bcb@bbeckerlaw.com

John Roberts
Law of John W. Roberts
30 Music Square West
Suite 305
Nashville, TN, 37203
john@johnwroberts.com

                                      /s/Mark T. Freeman
                                     Mark T. Freeman, Esq. (#16098)